**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | § § § § | Civil Action No. 1:16-cv-06551 |
| Plaintiff, | § | **ORAL ARGUMENT REQUESTED** |
| vs. | § § | |
| FOREX CAPITAL MARKETS, LLC, | § § | |
| Defendant. | § § § | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S PARTIAL**
**MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Israel Dahan
William Johnson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ...................................................................................5

    A.    FXCM and FX Trading .......................................................5

    B.    The SNB Flash Crash .........................................................7

    C.    FXCM's Actions After The SNB Flash Crash....................10

    D.    FXCM Repeatedly Warned Customers Of The Significant Financial Risks Of FX Trading ..........................................13

    E.    FXCM's General Policy Regarding Collection Of Customer Negative Balances ..............................................14

ARGUMENT ..........................................................................................................16

II.    The Court Should Dismiss the CFTC's Claim For Violation of Commission Regulation 5.6(a)(1), With Prejudice .........................18

III.    The Court Should Dismiss The CFTC'S Claim For Violation of Commission Regulation 5.16, With Prejudice....................................23

CONCLUSION .......................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                          **Page(s)**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
  No. 08-cv-7508, 2009 WL 3346674 (S.D.N.Y. Oct. 15, 2009).................................................17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................16, 17

*Berman v. Sugo LLC*,
  580 F. Supp. 2d 191 (S.D.N.Y. 2008).....................................................................................5

*Cent. Bank, N.A. v. First Interstate Bank, N.A.*,
  511 U.S. 164 (1994).....................................................................................................18

*Cooke v. United States*,
  91 U.S. 389 (1875).......................................................................................................25

*Cortec Industries, Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991)..............................................................................................5

*Federal Crop Ins. Corp. v. Merrill*,
  332 U.S. 380 (1947).....................................................................................................25

*Ginx, Inc. v. Soho Alliance*,
  720 F. Supp. 2d 342 (S.D.N.Y. 2010)..................................................................................5

*In the Matter of: IBFX, Inc. Respondent*,
  2014 WL 6988892 (CFTC No. 15-10 Dec. 10, 2014).......................................................21, 22

*Pinter v. Dahl*,
  486 U.S. 622 (1988).....................................................................................................18

*Retirement Board of the Policemen's Annuity v. FXCM Inc., et al.*,
  2016 WL 4435243 (S.D.N.Y. Aug. 18, 2016)....................................................................9, 10

*Silsby v. Icahn*,
  17 F. Supp. 3d 348 (S.D.N.Y. 2014)....................................................................................5

*Smith v. Local 819 I.B.T. Pension Plan*,
  291 F.3d 236 (2d Cir. 2002)..............................................................................................17

*United States v. Crobarger*,
  158 Fed. Appx. 100 (10th Cir. 2005)..................................................................................25

*United States v. Flemmi*,
  225 F.3d 78 (1st Cir. 2000).............................................................................................25

**Statutes**

Commodity Exchange Act Section 17 .................................................................................1

**Rules and Regulations**

17 C.F.R. § 1.12(a) ..........................................................................................................18

17 C.F.R. § 1.17(c)(1) ........................................................................................................7

17 C.F.R. § 5.6 ......................................................................................................... *passim*

17 C.F.R. § 5.6(a)(1) ................................................................................................ *passim*

17 C.F.R. § 5.6(a)(2) .......................................................................................................18

17 C.F.R. § 5.7 ............................................................................................................6, 17

17 C.F.R. § 5.16 ....................................................................................................... *passim*

49 Fed. Reg. 39593-01, 1984 WL 119132 (Oct. 9, 1984) ................................................5

Federal Rules of Civil Procedure 8(a) ...............................................................................1

Federal Rules of Civil Procedure 12(b)(6) ...................................................................1, 16

NFA Compliance Rule 2-36(b) ........................................................................................16

NFA Compliance Rule 2-39(a) ........................................................................................16

**Other Authorities**

FXCM Profitability Analysis (July 8, 2016) *available at*
    https://docs.fxcorporate.com/profitability_analysis_en.pdf?_ga=1.47827375.9
    66658482.1462223442 ...........................................................................................14

FXCM Provides Further Details on Financing With Leucadia National
    Corporation (January 19, 2015), *available at*
    http://ir.fxcm.com/releasedetail.cfm?ReleaseID=891881 ......................................12

Grace Cheng, 7 WINNING STRATEGIES FOR TRADING FOREX 51 (2007) .........................6

Maintenance of Minimum Financial Requirements by Futures Commission
    Merchants and Introducing Brokers, 63 Fed. Reg. 45,711 (Aug. 27, 1988) ............22

NFA Manual: NFA's Functions Explained, NATIONAL FUTURES ASSOCIATION,
    *available at*
    https://www.nfa.futures.org/nfamanual/NFAManual.aspx?RuleID=1001&Sect
    ion=1 .......................................................................................................................2

Public Report by the Division of Clearing and Intermediary Oversight on the
Registration Program of the National Futures Association, COMMODITY
FUTURES TRADING COMMISSION (June 2010) *available at*
http://www.cftc.gov/idc/groups/public/@iointermediaries/documents/file/nfar
egistrationreport2010.pdf....................................................................................................2, 24

Pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6), Forex Capital Markets, LLC ("FXCM" or the "Company") respectfully moves the Court to dismiss, with prejudice, Counts II and III of the First Amended Complaint (the "FAC") filed by the U.S. Commodity Futures Trading Commission ("CFTC") (Dkt. No. 36). The CFTC has now had multiple chances to file a complaint that contains *facts* sufficient to state a viable claim against FXCM for violation of Commission Regulation 5.6(a)(1) (Count II) and Commission Regulation 5.16 (Count III). It has still failed to do so. Indeed, in the FAC, the CFTC continues to ignore the factual record with respect to such claims and asserts a few "new" allegations that are nothing more than additional self-serving inferential suppositions and legal conclusions. Accordingly, Counts II and III must be dismissed, with prejudice.

## <u>INTRODUCTION</u>

On January 15, 2015, just days after the Swiss National Bank ("SNB") reassured the public that it was committed to maintaining the exchange rate of the Swiss franc ("CHF") to the euro ("EUR") at 1.2 CHF to 1 EUR, the SNB shocked the markets when it completely abandoned the currency peg in the middle of the European trading day (early morning U.S. time). This unexpected and abrupt action caused a market flash crash—within seconds the EUR/CHF exchange rate dropped over 40%, liquidity providers stopped providing quotes, and investors on the wrong side of the EUR/CHF peg (*i.e.*, long EUR, short CHF) lost billions (the "SNB Flash Crash").

Shortly after this unforeseen and unprecedented market event, FXCM personnel jumped into action to determine the amount of customer losses and perform other components of calculating the Company's net capital position in real time—an extremely unusual and complex analysis given the nature and timing of the SNB Flash Crash. Once FXCM was in a position to know that it was going to have a net capital shortfall, and even before completing a formal net

1

capital calculation, the Company immediately notified both the CFTC and the National Futures Association (the "NFA")[1] of the shortfall—the *first and only one* in the Company's 17-year history.

The potential effect of the SNB Flash Crash on FXCM received special attention from its regulators, the NFA and CFTC.  Not long after FXCM provided notice of its capital shortfall, NFA personnel arrived at FXCM's offices in New York to monitor the Company's handling of the capital shortfall.  In addition, the NFA placed certain trading restrictions on the Company and the CFTC demanded that the Company take steps to immediately remedy the capital shortfall or face a complete shutdown of its operations.  Given this ultimatum and the imminent threat of bankruptcy, FXCM's board of directors and senior management worked tirelessly and around the clock to raise the funds necessary to cure the capital shortfall.  By mid-afternoon on January 16, FXCM's parent company, FXCM, Inc., cured the capital shortfall through a $300 million loan from Leucadia National Corporation ("Leucadia").  Thus, FXCM's one-time net capital shortfall lasted only a period of hours, and was monitored by its regulators in real time.

Despite the Company's diligent response to the SNB Flash Crash and its complete transparency and cooperation with the regulators during its brief capital shortfall, the CFTC has nonetheless filed this unprecedented action against FXCM (almost two years after the SNB Flash

---

[1] The NFA is a registered futures association under Section 17 of the Commodity Exchange Act, and is the self-regulatory organization for the United States derivatives industry, including retail off-exchange foreign currency transactions.  The CFTC is the federal government's regulator for the futures market, but it relies on the NFA as its frontline registrar and monitor.  To this end, the NFA conducts most of the CFTC's registration and fitness examination activities, under the CFTC's supervision, as well as auditing and surveillance of NFA members; establishing and enforcing rules and standards for customer protection; and screening to determine fitness to become or remain a NFA member.  *See* Public Report by the Division of Clearing and Intermediary Oversight on the Registration Program of the National Futures Association, COMMODITY FUTURES TRADING COMMISSION, at i (June 2010) *available at* http://www.cftc.gov/idc/groups/public/@iointermediaries/documents/file/nfaregistrationreport2010.pdf; NFA Manual: NFA's Functions Explained, NATIONAL FUTURES ASSOCIATION, *available at* https://www.nfa.futures.org/nfamanual/NFAManual.aspx?RuleID=1001&Section=1.

Crash).  Even worse, in an attempt to make the action appear more than the mere one-time, 24-hour undercapitalization claim against FXCM that it is, the CFTC fabricates two additional claims against the Company.

First, in Count II, the CFTC contends that FXCM violated Commission Regulation 5.6(a)(1) because it "never affirmatively gave notice to the CFTC" of its undercapitalization and "[a]t best, FXCM's telephonic notice to the CFTC of its capital deficiency was made more than nine hours after [it] should have known it was undercapitalized."  Putting aside the fact that the CFTC totally misconstrues Regulation 5.6, nowhere in the FAC does the CFTC allege *facts* supporting these inconsistent arguments and the CFTC's self-serving, conclusory assertion that FXCM should have known it was undercapitalized as soon as the SNB Flash Crash occurred.  The CFTC's lack of factual support is not surprising given that the documents in the CFTC's possession and other documents of which the Court can take judicial notice confirm otherwise.  Indeed, the factual record demonstrates that, on January 15, FXCM promptly notified both the CFTC and NFA of its undercapitalization and did so even before completing its final net capital calculation.  Thus, the CFTC's claim is baseless.

Second, in Count III, the CFTC claims that FXCM's policy concerning collection of customer negative balances violates Commission Regulation 5.16 because it limits customer loss.  Again, the CFTC ignores the factual record in this case.  As demonstrated below, FXCM did not place limits on customer losses.  To the contrary, every customer who opened an account with FXCM was required to acknowledge that they have received no "freedom from loss" and neither the Company nor its representatives have agreed to "limit losses in [their] account." While FXCM may have decided, after losses occurred, not to collect negative balances (*i.e.,* losses beyond margin) from certain customers and due to certain trading circumstances, such a

discretionary action does not constitute a violation of Regulation 5.16.  Indeed, when Regulation 5.16 was adopted in 2010, the regulators explicitly told FXCM that it could have a policy not to collect customer negative balances so long as the policy does not *guarantee* against collection of such balances.  FXCM justifiably relied upon such guidance and proceeded with its limited, not absolute, policy against collection of customer negative balances under certain circumstances.

Significantly, since the passing of Regulation 5.16 and through the SNB Flash Crash—a period of more than four years—the regulators have repeatedly had the opportunity to review, and did review, FXCM's account opening documents and marketing materials and never once did they claim that the Company's policy not to collect negative balances from certain customers and in certain circumstances violated Regulation 5.16.  This is not surprising since the NFA's own Regulatory Guide permits FX trading companies, such as FXCM, to represent to customers that they will not collect negative balances.  In fact, the NFA's Regulatory Guide actually permits FX trading companies to "unconditionally guarantee" not to collect customer negative balances.  Thus, for the CFTC to now claim that FXCM's historical and approved policy concerning collection of customer negative balances violates Regulation 5.16 rings hollow.

Accordingly, the Court should grant FXCM's motion and dismiss Counts II and III of the FAC, with prejudice.

## FACTUAL BACKGROUND[2]

### A.    FXCM and FX Trading

Defendant FXCM is one of several operating subsidiaries of FXCM, Inc., which was founded in 1999 and is one of the world's largest online FX trading firms.  FXCM is a registered Futures Commission Merchant ("FCM") and a Retail Foreign Exchange Dealer ("RFED") with the CFTC.  FXCM is also a member of the NFA.[3]  Dahan Decl., Ex. 1, SEC Form 10-K (Mar. 17, 2014) ("2013 Annual Report"), at 8-9, 15.

FX trading was once the domain of large financial institutions and ultra-high-net-worth individuals, but the growth of online brokers, like FXCM, has enabled the public to trade in the global FX market.  The FX market is the largest, most liquid market in the world with an average daily trading volume exceeding $5.3 trillion.  There is no central exchange as it trades over the counter.  The FX market is generally the least volatile financial market because daily fluctuations

---

[2]  The facts discussed herein arise from the allegations in the FAC, documents cited or referred to in the Complaint, documents relied upon by or in the possession of the CFTC, and other documents of which the Court can take judicial notice. *See Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014).  Along with the Memorandum of Law, Defendant also submits and relies upon the Declaration of Israel Dahan ("Dahan Decl."), dated December 21, 2016, and the exhibits attached thereto.  All documents referenced with Bates numbers beginning "FXCM-CFTC" were produced by FXCM to the CFTC in connection with a 2015 investigation of the alleged violations asserted in the Complaint.  In total, FXCM produced approximately 38,000 pages of documents to the CFTC and the CFTC took testimony of three FXCM employees.  The Court may take judicial notice of and consider the pre-suit documents FXCM provided to the CFTC and the fact that the CFTC strategically chose not to use or reference such produced documents is irrelevant.  *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on the motion."); *Ginx, Inc. v. Soho Alliance*, 720 F. Supp. 2d 342, 352 (S.D.N.Y. 2010); *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 200-201 (S.D.N.Y. 2008) (same).  The Court also can take judicial notice of the documents FXCM attached as exhibits to its prior partial motion to dismiss since those documents were in the possession of the CFTC when they drafted and filed the FAC.  *See Berman*, 580 F. Supp. 2d at 200 (holding that a court may "consider documents that the pleader either possessed *or knew about* and that are integral to the complaint . . . because the pleading party has actual notice of the documents and relied upon them in bringing suit, even if they are not explicitly referenced") (emphasis added).

[3]  The CFTC has formally delegated its registration responsibilities with respect to FCMs and RFEDs to the NFA.  *See* Performance of Registration Functions by National Futures Association, 49 Fed. Reg. 39593-01, 1984 WL 119132 (Oct. 9, 1984).

in currency pairs are very small, especially for currencies of highly-developed countries. Because of low volatility in the FX market, traders typically rely on highly-leveraged trades to make FX investments.  Unlike their counterparts in equity markets, FX brokers offer their customers highly leveraged trading with lower margin requirements.  *See* Grace Cheng, 7 WINNING STRATEGIES FOR TRADING FOREX 51 (2007).

During the relevant period, FXCM was unique among FX brokers because it operated primarily on an agency-execution model (also known as a "No Dealing Desk" model) that it pioneered in 2007.  Under FXCM's agency model, FXCM receives price quotes from its interbank-liquidity providers—often large banks and financial institutions who are the counter-parties to the trades FXCM's customers' execute—and passes those prices on to its customers. FXCM essentially acts as a price aggregator: taking the best available bid/ask prices from liquidity providers and then streaming those prices to its customers via its online trading platform.  Because FXCM operates on an agency model, it is simply a bridge between its client and the liquidity providers.  FXCM's interests are aligned with its clients, and it does not profit from its clients' losses.  *See* Ex. 1 (2013 Annual Report) at 1, 7.[4]

FX trading firms are subject to jurisdictional net capital requirements.  In general, net capital requirements require that at least a minimum specified amount of a regulated entity's assets be kept in relatively liquid form, usually cash or cash equivalents.  *See* 17 C.F.R. § 5.7. Net capital is generally defined as net worth (current assets minus liabilities), plus qualifying subordinated borrowings and discretionary liabilities, less mandatory deductions that result from excluding assets that are not readily convertible into cash and from valuing conservatively other

---

[4] In contrast, many FX dealers operate on a principal-execution model (also known as a "Dealing Desk" model), whereby the dealer acts as the counter-party in its client's FX trades, which creates a conflict of interest—*i.e.*, the dealer makes money when the market moves against its clients' positions.

assets.  *See* 17 C.F.R. § 1.17(c)(1).  Prior to the SNB Flash Crash, FXCM had always met its net capital requirements and, in fact, always made sure to have a significant cushion above its net capital requirement.

**B.**     **The SNB Flash Crash**

In 2011, the Swiss franc and the euro nearly reached parity after the euro-zone economic crisis triggered large inflows into the franc.  On September 6, 2011, the SNB stated that "it will no longer tolerate a EUR/CHF exchange rate below the minimum rate of CHF 1.20," and that it will "enforce this minimum rate with the utmost determination and is prepared to buy foreign currency in unlimited quantities."  Dahan Decl., Ex. 2 (Sept. 6, 2011 SNB Press Release).  The Swiss franc was pegged to the euro at CHF 1.20 from January 14, 2011 to January 14, 2015.  *Id.*

On September 18, 2014, the SNB affirmed its commitment to the minimum exchange rate of CHF 1.20 per euro (*see* Dahan Decl., Ex. 3, SNB Press Release (Sept. 18, 2014)), and reiterated this commitment in a December 18, 2014 press release.  *See* Dahan Decl., Ex. 4, SNB Press Release (Dec. 18, 2014).  Thereafter, on January 5, 2015, SNB chairman Thomas Jordon publicly announced that the SNB's cap on the franc at 1.20 per euro is "absolutely central" to maintaining the right monetary conditions in Switzerland, given an increased threat of deflation.  *See* Dahan Decl., Ex. 5, SNB Chairman says cap on Swiss franc absolutely central: SRF, REUTERS, (Jan. 5, 2015).  And again on January 12, 2015, SNB vice-chairman Jean-Pierre Danthine stated that the cap on the Swiss franc will remain the *cornerstone* of Swiss monetary policy:  "We took stock of the situation less than a month ago, we looked again at all the parameters and *we are convinced that the minimum exchange rate must remain the cornerstone of our monetary policy*."  Dahan Decl., Ex. 6, REFILE-SNB's Danthine says cap on franc remains policy cornerstone, REUTERS, (Jan. 12, 2015) (emphasis added).

On January 15, 2015—only three days after SNB vice-chairman Danthine declared that the cap on the franc is the *cornerstone* of Swiss monetary policy—the SNB shocked the market by announcing that it was "discontinuing the minimum exchange rate of CHF 1.20 per euro." Dahan Decl., Ex. 7 (Jan. 15, 2015 SNB Press Release).  Even the CFTC acknowledges that the SNB's decision to remove the peg was unexpected.  *See* FAC at ¶ 11.  Within seconds of this surprise announcement there was market chaos with respect to the EUR/CHF pair, including extreme pricing and spreads and nearly zero available liquidity.  *See* Dahan Decl., Ex. 8, Pete Evans, Swiss franc surge knocks out brokerages, roils financial markets, CBC NEWS, (Jan. 16, 2015).[5]

A currency strategist at the Bank of Tokyo-Mitsubishi UFJ described the currency move on January 15 as "unprecedented."  Dahan Decl., Ex. 8.  Another FX research analyst stated that the SNB Flash Crash "was a bigger move than when the USSR collapsed, it was bigger than when George Soros bet against the pound, and it was even bigger than 9/11, in terms of the currency markets at least."  *Id.*  To put it in perspective, on January 15, euro price quotes ranged from CHF 1.20091 to 0.2000 (a range of 10,000 PIPs).[6]  In the 12-month period preceding the SNB Flash Crash, the euro traded in a range of CHF 1.2009 to 1.2364 (a range of 354 PIPs).  In the end, the Swiss franc soared as much as 41% versus the euro that day and the Swiss stock market tumbled over 10%—wiping out about CHF 100 billion off the main Swiss index.[7] Significantly, SNB chairman Thomas Jordan admitted that the SNB purposely misled the

---

[5] For a more detailed timeline of what transpired during the SNB Flash Crash, *see* FXCM Press Release (Mar. 11, 2015) (Dahan Decl. Ex. 9).

[6] "PIP" stands for Point in Percentage—one PIP equals 0.0001.  Of note, although the price quote ranges were initially quite large, these price quote fluctuations stabilized over the following hours.

[7] *See* Dahan Decl., Ex. 10, Alice Baghdjian and Silke Koltrowitz, *Swiss central bank stuns market with policy U-turn*, Reuters, (Jan. 16, 2015); Ex. 11, Elena Logutenkova, *Bank Losses From Swiss Currency Surprise Seen Mounting*, Bloomberg Business, (Jan. 19, 2015).

market—a remarkable admission for the leader of one of the world's largest central banks. He stated that "[i]f you decide to exit such a policy [*i.e.*, removing a currency peg], you have to take the markets by *surprise*" and that "[m]arkets tend to overreact when confronted with such a *surprise*." Dahan Decl., Ex. 10 (emphasis added).

The SNB Flash Crash had a devastating impact on FX traders and brokers throughout the world. For example, Citigroup, Deutsche Bank, and Barclays reported losses of about $400 million as a result of the SNB Flash Crash. *See* Dahan Decl., Ex. 11. Bloomberg reported that one large "hedge fund manager who survived at least five emerging-market debt crises, is closing his largest hedge fund, which had about $830 million in assets at the end of the year, after losing virtually all its money on the SNB's decision." *Id.* FXCM likewise did not escape the carnage caused by the SNB Flash Crash and its customers sustained significant losses. *See* Dahan Decl., Ex. 12 (Jan. 15, 2015 FXCM Press Release). Importantly, at the outset of the SNB Flash Crash, FXCM deployed its "seatbelt" system protecting customers against price spikes or abnormal movement, which ultimately saved customers from incurring millions of dollars in additional trading losses. Specifically, this seatbelt system saved customers from losses by preventing the execution of trades at disadvantageous prices while the market recovered and liquidity returned.[8]

---

[8] Notably, in dismissing a federal securities class action against FXCM, Inc., and its CEO and CFO, Judge Kimba M. Wood recognized the unforeseen and unpredictable nature of the SNB Flash Crash and found that it was logical for defendants to believe that "the same [agency] model and [seatbelt] safeguards that helped them navigate the SNB's initial decision to peg the Swiss Franc to the Euro [in 2011] would also help them navigate the de-pegging decision [in 2015]." *Retirement Board of the Policemen's Annuity v. FXCM Inc., et al.*, 2016 WL 4435243, at *9 (S.D.N.Y. Aug. 18, 2016). Thus, the CFTC's conclusory allegation that "[w]hen the SNB unexpectedly removed the currency peg" (FAC at ¶ 11), it should have known that it would become undercapitalized is simply unfounded.

### C.      FXCM's Actions After The SNB Flash Crash

The SNB Flash Crash occurred at around 4:30 a.m., EST, and lasted approximately one hour.  Shortly thereafter, FXCM personnel began to assess the amount of customer losses and perform the other calculations underlying the Company's net capital position (two separate and distinct processes).  To this end, FXCM personnel worked on two tracks: (1) a "back of the envelope" analysis of available Company equity and customer negative balances and (2) the formal process of calculating the Company's real-time net capital position, which factors in both positive and negative customer balances for all trading positions and deposits, not just in the EUR/CHF currency pair.  The latter exercise required extensive data gathering from FXCM's different servers, thousands of customer trading accounts, and hundreds of Company capital accounts in the U.S. and internationally that were constantly in flux given that the markets remained open in most time zones.  The formal, real-time capital calculation was unusual and complex due to the fact that it was being made during the trading day rather than based on closing balances of the day before.[9]  It was therefore a bit of a moving target.

At around 10:15 a.m. on January 15, after a flurry of meetings with FXCM management and finance staff, the Company's Chief Compliance Officer (the "CCO") returned to her desk and discovered an e-mail from a NFA Associate Director of Investigations (the "NFA Associate Director"), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See* Dahan Decl., Ex. 13 (Jan. 15, 2015 e-mail exchange, FXCM-CFTC-00024611-12).  At that point in time, the Company did not yet know whether it had a regulatory capital shortfall.

Shortly thereafter, the CCO called the NFA Associate Director and left a voicemail stating that she was available to discuss the topics raised in the NFA Associate Director's email.

---

[9]  In a normal trading day, the Company's net capital position is calculated at the end of a trading day using final Company and customer account balances.

*Id.* After leaving this voicemail, the two traded e-mails over the course of the next couple hours. *Id.* During this time, the Company continued to work on its net capital calculation and assess whether it had a regulatory capital shortfall.  At approximately 1:00 p.m., the CCO had a conference call with the NFA Associate Director and others from the NFA in which she informed the NFA that, ████████████████████████████████████████████████████████ ████████████████████████████████████████████ *Id.*; *see also* Dahan Decl., Ex. 14 (Jan. 15, 2015 e-mail attaching letter, FXCM-CFTC-00006143-44*).*  A few minutes after this call, NFA personnel arrived at FXCM's offices in New York to monitor the situation and address FXCM's capital shortfall.  At 1:40 p.m., the CCO had a follow-up conference call with senior personnel from both the NFA and CFTC during which ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████[10]  *See* Dahan Decl., Ex. 14.  At that time, FXCM senior management had begun the process of procuring additional funds, a development that was monitored by NFA and CFTC personnel.

At approximately 4:30 p.m., the NFA transmitted a letter to FXCM ████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ *See* Ex. 14.  In the letter, the NFA advised that, ██████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████  *Id.*  At approximately, 5:00 p.m., FXCM was informed that ██████████████ ████████████████████████████████████████████████████████████████████████

---

[10] Company call logs show that the first call with the NFA occurred at 1:04 p.m. EST and the second call with both the NFA and CFTC occurred at 1:40 p.m. EST.

████████████████████████████████ *See* Dahan Decl., Ex. 15 (Jan. 15, 2015 e-mail exchange).

From the afternoon of January 15 and continuing through the afternoon of January 16, the Board of Directors of FXCM, Inc. (the "Board") and senior management worked tirelessly to find potential capital sources to avoid a Company shut-down and bankruptcy. The Company's finance department likewise worked through the evening to finalize the net capital calculation and determine the precise amount of capital shortfall. To that end, the Company continuously provided documentation and other information to the CFTC and NFA concerning the ongoing net capital calculation and the capital raise efforts. *See* Dahan Decl., Ex. 16 (Jan. 16, 2015 letter, FXCM-CFTC-00006175); Ex. 17 (Jan. 15, 2015 e-mail exchange, FXCM-CFTC-00007793-94); Ex. 18 (Jan. 15, 2015 e-mail exchange, FXCM-CFTC-00007806-07); Ex. 19 (Jan. 16, 2015 e-mail exchange, FXCM-CFTC-00007833-34); Ex. 20 (Jan. 16, 2015 e-mail, FXCM-CFTC-00007837); Ex. 21 (Jan. 16, 2015 e-mail exchange, FXCM-CFTC-00007844-45).

During this 24-hour period, the Company sought deals with several potential investors, but nearly all were unwilling to execute a transaction, especially within the short timeframe demanded by the regulators. Fortunately, FXCM was able to find one investor willing to provide a rescue: Leucadia. Leucadia agreed to provide the Company with a loan in the amount of $300 million. At approximately 3:00 p.m., on January 16, the Board met and approved the deal with Leucadia, which the CFTC and NFA also found satisfactory. At 3:56 p.m., the NFA sent a letter to the Company stating that ████████████████████████████████ ████████████████████████████████████████████ *See* Dahan Decl., Ex. 22 (Jan. 16, 2015 e-mail attaching letter, FXCM-CFTC-00006178-80).

### D. FXCM Repeatedly Warned Customers Of The Significant Financial Risks Of FX Trading

Prior to 2010 and continuing through the SNB Flash Crash in 2015, FXCM repeatedly warned customers of the significant financial risks associated with FX trading. Specifically, in FXCM's Client Agreement, which is the operative agreement that governs the relationships between FXCM and its customers, FXCM warned customers of the following:

> 14. RISK ACKNOWLEDGMENT. Trader acknowledges that investments in leveraged and non-leveraged transactions are speculative, *involves a high degree of risk, and is appropriate only for persons who can assume risk of loss **in excess of their margin deposit**.* Trader understands that because of the low margin normally required in OTCFX trading, price changes in OTCFX *may result in significant losses that may substantially **exceed** Trader's investment and margin deposit.* Trader warrants that Trader is willing and able, financially and otherwise, to assume the risk of OTCFX trading, and in consideration of FXCM's carrying his/her account(s), *Trader agrees not to hold FXCM responsible for losses incurred through following its trading recommendations or suggestions or those of its employees, agents or representatives.* ***Trader recognizes that guarantees of profit or freedom from loss are impossible of performance in OTCFX trading. Trader acknowledges that Trader has received no such guarantees from FXCM or from any of its representatives*** *or any referring broker or other entity with whom Trader is conducting his/her FXCM account and has not entered into this Client Agreement in consideration of or in reliance upon any such guarantees or similar representations.*

*See* Dahan Decl. Ex. 23 (Sept. 19, 2014 Client Agreement, FXCM-CFTC-00037163-89) at FXCM-CFTC-00037167 (emphasis added). In addition, the Client Agreement provides that "[i]f any loss or debit balance exceeds all amounts so held, Trader must forthwith pay such excess to FXCM whether demanded or not." *Id.* at FXCM-CFTC-00037169. And in a section entitled "NO GUARANTEES," FXCM customers also acknowledged that they have "no separate agreement with [customer's] broker or any FXCM employee or agent regarding the trading in [customer's] FXCM account, ***including any agreement to guarantee profits or limit losses in [customer's] account***." Ex. 23 at FXCM-CFTC-00037167 (emphasis added).

Moreover, in its public filings, FXCM warned customers and investors of the severe risks of FX trading in the event of "exceptional volatility" and a "suspension of liquidity," such as what occurred during the SNB Flash Crash. *See* Ex. 1 (2013 Annual Report), at 10-11, 25, 79-80. FXCM specifically disclosed that "[s]ignificant swings in the market volatility can also result in increased customer trading losses, higher turnover and reduced trading volume." *Id.* at 39. "Although our margining practices are designed to mitigate this risk, we may be unable to close out customer positions at a level where margin posted by the customer is sufficient to cover the customer's losses. *As a result, a customer may suffer losses greater than any margin or other funds or assets posted by that customer or held by us on behalf of that customer.*" *Id.* at 25 (emphasis added). These warnings of loss were bolstered by real figures of customers' profit and loss, which were made available on FXCM's website and indicate that the majority of FXCM's customers lost money when trading FX.[11]

### E.   FXCM's General Policy Regarding Collection Of Customer Negative Balances

As demonstrated above, FXCM made it abundantly clear to customers that they could incur and be responsible for significant trading losses, including losses in excess of their margin and funds on deposit. At the same time, FXCM also informed customers that, under certain circumstances, the Company may decide not to collect negative balances incurred as a result of trading during normal market conditions (unlike the SNB Flash Crash). Specifically, in Clause 7 of the Client Agreement, FXCM informed customers that its platforms are designed with safeguards to generally prevent customers from incurring a negative balance while trading under *normal market conditions*. The Clause noted that it was possible that the safeguards may fail,

---

[11] For example, FXCM's publicly-available profitability analysis indicates that in the last two quarters of 2015 and the first two quarters of 2016, approximately 70% of FXCM customers lost money when trading FX. *See* FXCM Profitability Analysis (July 8, 2016) *available at* https://docs.fxcorporate.com/profitability_analysis_en.pdf?_ga=1.47827375.966658482.1462223442.

causing the customer to incur a negative balance, and in such a case, the customer should inform FXCM's trade audit team and the Company "will evaluate the inquiry and credit the [customer's account] with the amount of the negative balance where the debit was due to trading activity," subject to several limitations explicitly set forth in Clause 7.  Ex. 23 at FXCM-CFTC-00037166. FXCM's general policy not to collect negative account balances from certain customers and in certain circumstances was well-known to the CFTC and NFA.  *See* Ex. 1 at 11 (2013 Annual Report); Dahan Decl., Ex. 24 (Jan. 23, 2015 e-mail exchange, FXCM-CFTC-00008371).

In September 2010, the CFTC adopted several new regulations, including Regulation 5.16, which restricts FCMs or RFEDs from guaranteeing against or limiting customer loss.  In a good faith effort to understand the scope and application of the new rules, FXCM had several written and verbal communications with the NFA concerning the rules, including Regulation 5.16.  Specifically, on September 9, 2010, ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████  Dahan Decl., Ex. 25 (Sept. 9, 2010 e-mail).  A few days later, FXCM again wrote to the NFA stating that ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████  Dahan Decl., Ex. 26 (Sept. 16, 2010 series of e-mails).

On September 21, 2010, the NFA and FXCM finally had a call to discuss ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

████████████████ Dahan Decl., Ex. 27 (Sept. 22, 2010 e-mail).[12]  In light of the NFA's guidance, FXCM made a good faith effort to modify its account opening documents and promotional materials in the U.S. and to remove any language that could be construed as *guaranteeing* against collection of negative balances.

After the adoption of Regulation 5.16 in 2010 and continuing through the SNB Flash Crash in 2015, the NFA routinely requested and reviewed FXCM's account opening documents and promotional materials as part of its yearly audits to ensure that the Company had complied with applicable CFTC and NFA regulations.  At no point during any of these yearly audits or at any other time during this more than four-year period did either the NFA or CFTC ever question the legality of FXCM's advertised policy concerning collection of customer negative balances.[13]

## ARGUMENT

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must evaluate the sufficiency of the complaint under the "two-pronged approach" outlined by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are insufficient to withstand a motion to dismiss.  *Id.* at 678; *accord Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) ("conclusory allegations or legal conclusions masquerading as factual conclusions will not

---

[12] Notably, the NFA actually permits FCMs to "unconditionally guarantee" not to collect negative balances and warns dealers that if they seek to collect deficit balances when they provide such an unconditional guarantee they will be liable for misrepresentation.  *See* Forex Transactions: A Regulatory Guide, NATIONAL FUTURES ASSOCIATION, at 113 (Dec. 2016), Dahan Decl. Ex. 28 ("NFA Regulatory Guide").

[13] Of note, one of FXCM's main competitors, GAIN Capital, which conducts its retail FX business through Forex.com, had a similar advertised policy concerning non-collection of customer negative balances and, to FXCM's knowledge, has not been accused by the CFTC or NFA of violating Commission Regulation 5.16.  *See, e.g.*, Dahan Decl. Ex. 29, Forex.com Trade Overview ("Our margin policy eliminates concerns about debit balances by guaranteeing that you will never owe more than you have in your account.").

suffice to prevent a motion to dismiss") (citations omitted).  Second, plaintiff's well-pleaded allegations, accepted as true, must state a claim that is plausible on its face.  *See Iqbal*, 556 U.S. at 679.  It is not enough for a plaintiff to plead "a sheer possibility that a defendant has acted unlawfully."  *Id.* at 678.

As demonstrated below, the FAC is rife with conclusory statements, legal conclusions and mere recitations of statutory language, as opposed to specific *facts* establishing a plausible claim against FXCM for violation of either Commission Regulation 5.6(a)(1) (Count II) or 5.16 (Count III).  Moreover, the operative facts—which the CFTC continues to ignore and omit from the FAC—actually undermine any such claims.  Accordingly, Counts II and III should be dismissed,[14] and such dismissal should be with prejudice given the Court's admonition that "[i]f plaintiff chooses to amend the complaint, it shall have a single opportunity to do so."  *See* Order dated Nov. 23, 2016 (Dkt. No. 27).

## II.   THE COURT SHOULD DISMISS THE CFTC'S CLAIM FOR VIOLATION OF COMMISSION REGULATION 5.6(a)(1), WITH PREJUDICE

As an initial matter, the CFTC misconstrues Commission Regulation 5.6.  In Count II, the CFTC focuses only on the first part of Regulation 5.6, which provides that "notice must be given *immediately*[15] after the [FCM or RFED] *knows or should know*" that it has a regulatory capital shortfall.  *See* 17 C.F.R. § 5.6(a)(1) (emphasis added).  But Regulation 5.6 has a second part that must be read in conjunction with the first part, especially given the "and" between the two parts.

---

[14] Although FXCM is not moving for dismissal of Count I (Violation of Commission Regulation 5.7), it will challenge, at the appropriate time, the merits of such claim.  This case does not bear the hallmarks of the other CFTC enforcement actions involving a claim for undercapitalization in violation of Commission Regulation 5.7.  Indeed, FXCM is unaware of a prior instance where a company was held liable for a one-time, twenty-four hour undercapitalization caused by unprecedented market events, as opposed to the company's bad acts.

[15] The Commission Regulations do not define the term "immediately" or provide any guidance as to what period of time constitutes immediate notice.

Specifically, Regulation 5.6(a)(2) states that the FCM or RFED should "*provide together with such notice* [under 5.6(a)(1)], the documentation in such form as necessary to adequately reflect the [FCM's or RFED's] capital condition" as of the date of undercapitalization.  *See* 17 C.F.R. § 5.6(a)(2) (emphasis added).  A common sense reading of the regulation is that a FCM or RFED, such as FXCM, does not have to give notice of a regulatory capital shortfall unless and until it (1) knows or should know of its capital shortfall <u>and</u> (2) has adequate documentation reflecting its capital shortfall.[16]

The FAC does not—and cannot—allege facts showing that FXCM failed to give immediate notice of its regulatory capital shortfall after it knew of such shortfall <u>and</u> had prepared the supporting documentation reflecting its final calculation of such shortfall.  To the contrary, the CFTC concedes that the Company was unable to complete its final net capital calculation until the evening of January 15 (FAC at ¶ 12); yet, the Company gave notice of its undercapitalization early afternoon on January 15 and the regulators confirmed such notice, as described above.[17]  Accordingly, the CFTC's claim in Count II must be dismissed because it is not viable based on the language of the statute and the insufficiency of the facts pleaded.

---

[16]  Notably, a companion regulation codified at 17 C.F.R. § 1.12(a) (not applicable to RFEDs such as FXCM), contained in the general regulations chapter governing minimum financial and reporting requirements, provides a virtually identical requirement to Regulation 5.6 with one important modification to subsection (a)(2)—Regulation 1.12(a)(2) provides an *exception* to the requirement that a FCM provide documentation of its capital condition along with its notice of undercapitalization under 1.12(a)(1).  Specifically, if that FCM is unable to calculate or immediately determine its financial condition, it may not delay its notice of undercapitalization under 1.12(a)(1) until it is able to calculate its actual net capital.  The inclusion of such an exception in Regulation 1.12(a)(2), and the CFTC's conscious choice not to provide the same exception in the companion Regulation 5.6(a)(2), is instructive.  In fact, the United States Supreme Court has repeatedly stated that a statute's omission of a feature found in a similar statute should be deemed intentional.  *See Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 176 (1994) ("Congress knew how to impose aiding and abetting liability when it chose to do so.");  *Pinter v. Dahl*, 486 U.S. 622, 650 (1988) ("When Congress wished to create such liability, it had little trouble doing so.").

[17]  The CFTC's assertion that "FXCM never affirmatively gave notice to the CFTC" of its undercapitalization (FAC at ¶ 20) is completely unfounded and contradicted by other allegations in the

But even if the Court were to read Regulation 5.6 as proposed by the CFTC (it should not), the CFTC's claim in Count II still fails and must be dismissed.  In support of its claim for violation of Regulation 5.6(a)(1), the CFTC essentially alleges that the Company "knew or should have known it was undercapitalized" at 4:30 a.m. when the SNB Flash Crash occurred, but nonetheless failed to provide telephonic notice of its undercapitalization until, at best, "nine hours" later.  *See* FAC at ¶¶ 10-12, 19-22.  The CFTC has finally recognized that it cannot ignore the factual record which establishes FXCM's undeniable telephonic notice of its undercapitalization at approximately 1:00 p.m. on January 15, and ██████████████████ ███████████████████████████████████  *See* Ex. 14.  But unfortunately, the CFTC continues to believe that it can satisfy its burden of pleading a sustainable claim for violation of Regulation 5.6(a)(1) by relying on self-serving inferential suppositions and legal conclusions.  It cannot.

Despite being afforded the opportunity to amend its complaint, the CFTC has still failed to put forth any *facts* supporting its conclusory contention that FXCM knew or should have known it was undercapitalized at the moment when the SNB Flash Crash occurred.  FXCM's failure to allege such factual support is even more revealing in this action, a regulatory enforcement action, since the CFTC had the full opportunity to, and in fact did, conduct extensive investigative discovery with respect to the claims in this action.  To this end, the CFTC subpoenaed and received tens of thousands of pages of documents from FXCM and took the testimony of multiple Company witnesses.  Nonetheless, the CFTC has not cited the testimony of

---

FAC.  In fact, in the very next sentence after this unsupported contention, the CFTC admits that "[i]t was only after the NFA and the CFTC initiated contact that *FXCM provided notice of its capital deficiency*. *Id.* (emphasis added).  *See also id.* at ¶ 2 ("On or about January 15, 2015 . . . FXCM belatedly reported that FXCM was not in compliance with its adjusted net capital requirement."); *id.* at ¶ 21 ("At best, FXCM's telephonic notice to the CFTC of its capital deficiency was made more than nine hours after FXCM should have known it was undercapitalized.").

a single Company witness who admitted an awareness of undercapitalization shortly after the SNB Flash Crash and well before 1:00 pm on January 15.  Likewise, the CFTC has failed to cite to a single email, financial spreadsheet or other document reflecting the Company's awareness of undercapitalization moments after the SNB Flash Crash and much earlier than 1:00 p.m. on January 15.  Such facts, or something similar, are necessary to support the CFTC's self-serving conclusion that FXCM "knew or should have known" of its undercapitalization immediately after the SNB Flash Crash occurred.

In the FAC the CFTC asserts that because "FXCM's losses were significant and immediate on January 15" and FXCM "immediately contacted supervisors and managers not on site to begin attempting to manage the event" (FAC at ¶ 20) the Company "knew or should have known" it was going to have a capital deficiency moments after the SNB Flash Crash.  *Id.* at ¶¶ 19-20.  This is simply untrue.  Trading losses, even significant ones, do not automatically lead to an undercapitalization.  Losses are only one part of the net capital calculation.  Net capital is just that—a net number that reflects both positive and negative balances across the firm, involving all customers and all trading positions—not just losses by some customers in one currency trading pair.  And as described above, the only way for the Company to know if it was going to have a capital deficiency was by conducting such a net capital calculation, which was extremely complex and took time on January 15 given the nature of the SNB Flash Crash.  Indeed, FXCM had to analyze in real time the fluctuating balances of hundreds of Company capital accounts and thousands of customer trading accounts in the U.S. and internationally because it could determine the true capitalization of the Company.  The CFTC has not alleged that a net capital calculation existed well before 1:00 p.m. on January 15 that reflected an undercapitalization once losses were offset by positive sources of capital.  Without that, Plaintiff's unsupported contention

that FXCM knew or should have known it was going to be undercapitalized prior to giving telephonic notice at approximately 1:00 p.m. on January 15 is deficient.

Moreover, the CFTC's contention that FXCM's notice was untimely because it allegedly occurred "nine hours" after the SNB Flash Crash is at odds with its conclusion in another matter that notice more than *ten hours* after the undercapitalization event *was timely*. *See In the Matter of: IBFX, Inc. Respondent*, 2014 WL 6988892 (CFTC No. 15-10 Dec. 10, 2014). In that case, the CFTC brought claims against IBFX, Inc., for *three* separate undercapitalization violations spanning three years, one of which occurred on June 9, 2014. On that date, IBFX noticed a system glitch at 3:45 a.m. that was causing a high frequency of incorrect trades. *Id.* at *3. IBFX shut its trading systems down between the hours of 5:00 and 6:00 a.m. *Id.* "IBFX then began the process of quantifying and covering its exposure" yet it "lacked the ability to determine exposure of the type created by the software error . . . on a real time basis." *Id.* at *4. According to the CFTC, IBFX then "promptly reported" at 1:35 p.m.—*10 hours after the system glitch*— that it had a net capital deficit of $19 million. *Id.* IBFX then engaged in additional calculations to more accurately determine its net capital position, which indicated a shortfall twice the amount it originally reported. *Id.* Nonetheless, the CFTC deemed IBFX's notification of a net capital deficit as "timely" and did not sue IBFX for violation of Regulation 5.6(a)(1). *Id.* Thus, FXCM's telephonic notice of its undercapitalization nine hours after the SNB Flash Crash and promptly after it truly knew it was undercapitalized should be deemed timely.

Recognizing the flaws in its claim that FXCM's telephonic notice of undercapitalization on January 15 was untimely, the CFTC now claims, for the first time, that FXCM's violated Regulation 5.6(a)(1) because it allegedly failed to send a follow-up facsimile concerning its undercapitalization until a week after the SNB Flash Crash. *See* FAC at ¶ 22. It is not surprising

that the CFTC did not assert such an allegation in its initial Complaint or make such an argument in its pre-motion response letter to Judge Torres (Dkt. No. 18), because it is absurd.  The purpose of the notice requirement under Regulation 5.6 is "to afford the CFTC and industry self-regulatory organizations (SROs) sufficient advance notice of a firm's financial or operational problems to take any protective or remedial action that may be needed to assure the safety of customer funds and the integrity of the marketplace."  Maintenance of Minimum Financial Requirements by Futures Commission Merchants and Introducing Brokers, 63 Fed. Reg. 45,711 (Aug. 27, 1988).  There can be no question that the numerous telephonic, written and in-person communications FXCM had with the CFTC and NFA on January 15 afforded the regulators such opportunity.  Indeed, by early afternoon on January 15, the regulators took remedial action by placing certain trading restrictions on the Company until effective steps were taken by the Company to cure the capital shortfall.  FXCM is unaware of a single case where the CFTC claimed, let alone established, a violation of Regulation 5.6(a)(1) where, as here, the RFED had several telephonic communications with the regulators concerning its undercapitalization; the RFED's notice of undercapitalization was confirmed in writing by the regulators; the RFED provided the regulators with documentation concerning the amount of its undercapitalization; but the RFED did not also send a "facsimile" confirming its undercapitalization until a week after the undercapitalization event.

Also, there is no dispute that shortly after FXCM's telephonic notice at approximately 1:00 p.m., NFA personnel arrived at FXCM's offices in New York to monitor the Company's handling of the capital shortfall and the CFTC told the Company that it too would send personnel to FXCM's offices.  Such NFA and CFTC personnel remained at FXCM's offices until the Company cured the capital shortfall in the afternoon of January 16, with the signing of the $300

million loan from Leucadia.  If the regulators truly believed that FXCM's notice was incomplete they would have been sure to mention it during the frequent interaction with FXCM on January 15 and 16.  Yet, at no point during its numerous verbal and written communications with FXCM on January 15 and 16, did the CFTC or NFA raise such a concern with the Company.

In short, the CFTC has had ample opportunity to develop and allege a factual record supporting its contention that FXCM's failed to comply with the notice provision of Regulation 5.6(a)(1), but has utterly failed to do so.  Accordingly, the Court should dismiss the CFTC's claim against FXCM for violation of Regulation 5.6(a)(1), with prejudice.

## III.   THE COURT SHOULD DISMISS THE CFTC'S CLAIM FOR VIOLATION OF COMMISSION REGULATION 5.16, WITH PREJUDICE

The CFTC contends that FXCM's policy concerning collection of customer negative balances violates Commission Regulation 5.16 because it limits customer loss.  *See* FAC at ¶¶ 23, 32-33.  It seems that the CFTC has wisely abandoned its initial theory that FXCM's policy violated Regulation 5.16 because it "guaranteed customers against loss."  *See* Complaint (Dkt. 1), at ¶ 21.  As demonstrated above, FXCM *never* guaranteed customers against trading loss.  To the contrary, FXCM's Client Agreement and public filings repeatedly warned customers of the significant risks of trading FX and that they could sustain and be responsible for trading losses even in excess of their margin account and funds on deposit.

But even the CFTC's new theory that FXCM's policy inappropriately limits customer loss lacks merit and is contrary to the factual record.  FXCM did not place limits on customer losses.  To the contrary, when opening a trading account with FXCM, customers acknowledged that they have received no "freedom from loss" and have not entered into a separate agreement under which the Company or its representatives agreed to "limit losses in [their] account."  *See* Ex. 23 at FXCM-CFTC-0037167.  FXCM's discretionary decision, after losses have occurred in

a particular customer's account (losses which FXCM's policy does not restrict or mitigate in any way), not to collect the ensuing negative balance was not a limitation on loss within the meaning of Regulation 5.16.

Significantly, the regulators themselves have acknowledged that FXCM's policy does not violate Regulation 5.16.   As demonstrated above, when Regulation 5.16 was adopted in September 2010, the NFA explicitly represented to FXCM that it could have a policy not to collect customer negative balances so long as such policy did not *guarantee* against such collection.   In light of the NFA's designated role in interpreting and providing guidance concerning the CFTC's rules and regulations, FXCM was justified in relying upon the NFA's representation and proceeding with a limited, not absolute, policy against collection of customer negative balances.[18]   Indeed, FXCM's policy has numerous exceptions as detailed in the Client Agreement.   *See* Ex. 23 at FXCM-CFTC-00037166.   FXCM's reliance on the NFA's guidance was further warranted given that the NFA's own Regulatory Guide permits FCMs to represent to customers that they would not collect negative balances.   *See* Ex. 28 (NFA Regulatory Guide) at 109, 113.

---

[18] The NFA is the CFTC's agent with respect to duties that have been delegated to the NFA, including interpretation of regulations affecting FCMs and RFEDs.  The CFTC itself has stated that, beginning in 1983, the "Commission began a series of delegations to the National Futures Association [] regarding the registration of intermediaries . . . . Over the course of the . . . years, the *Commission's delegations have assigned nearly the entirety of registration and fitness examination activities to the NFA*.   The Commission retains a supervisory role over NFA's execution of these activities."  Public Report by the Division of Clearing and Intermediary Oversight on the Registration Program of the National Futures Association, COMMODITY FUTURES TRADING COMMISSION, at i (June 2010) *available at* http://www.cftc.gov/idc/groups/public/@iointermediaries/documents/file/nfaregistrationreport2010.pdf.  When a government agent takes action for its principal that is within that agent's authority, the principal is bound by those actions.   *See Cooke v. United States*, 91 U.S. 389, 398 (1875); *United States v. Crobarger*, 158 Fed. Appx. 100, 105 (10th Cir. 2005) (citing *United States v. Flemmi*, 225 F.3d 78, 85 (1st Cir. 2000); *see also  Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947) (the scope of a government agent's power is determined by official delegations of that authority).  Thus, the CFTC is bound by the NFA's representations to FXCM concerning the application of Regulation 5.16.

In addition, since the adoption of Regulation 5.16 and through the SNB Flash Crash—a more than four-year period—both the CFTC and NFA were aware that FXCM continued to advertise its limited policy concerning collection of negative balances and never once did they inform the Company that the policy violated Regulation 5.16.   In fact, the NFA routinely reviewed FXCM's account opening documents and promotional materials during its yearly audits of FXCM during this four year period and at no point during such reviews did it question the appropriateness or legality of FXCM's policy.   Thus, for the CFTC to assert now, many years after the passing of Regulation 5.16, that FXCM's limited policy concerning collection of customer negative balances violates Regulation 5.16 is patently unjust and inequitable.[19]

Accordingly, the Court should dismiss the CFTC's claim against FXCM for violation of Regulation 5.16, with prejudice.

<u>**CONCLUSION**</u>

For all the foregoing reasons, FXCM respectfully requests that the Court grant its motion and dismiss Counts II and III in the FAC, with prejudice.

KING & SPALDING LLP

*/s/ Israel Dahan*
Israel Dahan
William Johnson
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100
Fax: (212) 556.2200
idahan@kslaw.com
wjohnson@kslaw.com

*Attorneys for Forex Capital Markets, LLC*

---

[19] FXCM is unaware of any other instance where the CFTC has used Regulation 5.16 in this manner, where the FCM or RFED had not engaged in actual fraud and misrepresentation to customers concerning their potential trading losses.  It is also notable that competitors of FXCM have similarly represented to customers that they would not collect negative account balances and yet, to our knowledge, the CFTC is not pursuing those competitors for violations of Regulation 5.16.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 22, 2016, the foregoing *Memorandum of Law In Support of Defendant's Partial Motion to Dismiss Plaintiff's First Amended Complaint* was electronically delivered to all counsel of record via the Southern District of New York's CM/ECF system.

*/s/ Israel Dahan*